# IN THE SUPREME COURT OF TEXAS

════════════

No. 18-0068

════════════

WARNER BROS. ENTERTAINMENT, INC.;
WARNER BROS. TECHNICAL OPERATIONS, INC. D/B/A WARNER BROS. ADVANCED
DIGITAL SERVICES; TMZ PRODUCTIONS, INC.; EHM PRODUCTION, INC. D/B/A
TMZ; TMZ.COM; AND ELIZABETH MCKERNAN, PETITIONERS,

v.

ROBERT JONES, RESPONDENT

════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT

════════════════════════════════════════════

**Argued September 19, 2019**

JUSTICE GUZMAN delivered the opinion of the Court, in which JUSTICE LEHRMANN, JUSTICE DEVINE, JUSTICE BUSBY, and JUSTICE BLAND joined.

CHIEF JUSTICE HECHT filed a dissenting opinion, in which JUSTICE GREEN and JUSTICE BLACKLOCK joined.

JUSTICE BOYD did not participate in the decision.

Long before the internet revolutionized the way the public experiences mass media, pundits

remarked     in various formulations     that a lie can travel halfway around the world before the truth

can get its boots on.[1]  And centuries before that, Jonathan Swift observed that "[f]alsehood flies, and the truth comes limping after it, so that when men come to be undeceived, it is too late."[2] Recognizing that falsehoods spread quickly and are hard to dispel,[3] the Defamation Mitigation Act (DMA) induces publishers and claimants to take prompt action to mitigate reputational injuries that may ensue from defamatory publications.[4]

This defamation lawsuit involves allegations that an internet tabloid rushed to publish a salacious article about an alleged murder-for-hire plot featuring a former Dallas Cowboys football player as a violent "gangster" who threatened to make "a man named Theodore" "disappear" for refusing to kill a sports agent.  According to the plaintiff, the publisher intentionally ignored red flags about the informant's credibility, failed to undertake basic due-diligence efforts, and maligned him in a way the law recognizes as per se harmful.[5]  The question we address today is not the verity of these allegations, which is not before us at this juncture of the litigation, but whether the plaintiff's lawsuit must be dismissed for asserted noncompliance with the statutory method for mitigating

---

[1] Joshua Gillin, *NFL's Colin Kaepernick Incorrectly Credits Winston Churchill for Quote About Lies*, POLITIFACT (Oct. 9, 2017), https://www.politifact.com/punditfact/statements/2017/oct/09/ colin-kaepernick/nfls-colin-kaepernick-incorrectly-credits-winston-/.

[2] Jonathan Swift, *The Examiner No. 14* (Sept. 11, 1710), https://www.ourcivilisation.com/smartboard/shop/swift/examiner/chap14.htm.

[3] *See* Megan McCardle, *We Finally Know for Sure That Lies Spread Faster Than the Truth. This Might be Why.*, WASHINGTON POST (Mar. 14, 2018), https://www.washingtonpost.com/opinions/we-finally-know-for-sure-that-lies-spread-faster-than-the-truth-this-might-be-why/2018/03/14/92ab1aae-27a6-11e8-bc72-077aa4dab9ef story.html (reporting the results of a study on how quickly lies spread).

[4] TEX. CIV. PRAC. & REM. CODE §§ 73.051–.062; *see Mitigate*, BLACK'S LAW DICTIONARY 1154 (10th ed. 2104) ("To make less severe or intense; to make less harmful, unpleasant, or seriously bad[.]").

[5] *D Magazine Partners, LP. v. Rosenthal*, 529 S.W.3d 429, 439 (Tex. 2018) (accusing someone of committing a crime is defamation per se).

damages. Because the plaintiff complied with the statute, we hold that the trial court properly denied the publisher's motion to dismiss. We therefore affirm the court of appeals' judgment.

## I. Background

Robert Jones is a former Dallas Cowboys football star who played ten seasons in the National Football League (NFL). His illustrious career is marked by several notable accomplishments: first-round draft pick in 1992, NFL Rookie of the Year in 1992, NFL Pro Bowl player, and three-time Super Bowl champion. After retiring in 2002, Jones took up residence in Austin, where he runs a business.

Theodore Watson, Jones's cousin, has led a less storied life with a criminal history spanning decades. Shortly before the events giving rise to this lawsuit, Watson was incarcerated in Ohio after pleading guilty to attempted aggravated arson and insurance fraud. Soon after he was discharged from parole in 2014, Watson began harassing Jones in an attempt to extort money from him.

Jones's lawyer, Nicolas Bressi, sent Watson a cease-and-desist letter on June 10, 2014. Two days later, Watson responded to Bressi's letter by calling his office and leaving a threatening voicemail. The same day, Watson called the "hot tip" line for internet tabloid TMZ.com to report that Jones had threatened to harm him for refusing to murder Jones's former agent. TMZ reporter Elizabeth "Liz" McKernan replied to Watson by email, and they spoke by telephone twice that day.

Later that afternoon, Bressi sent Watson an email warning him to cease further communications:

```
Subject:  Robert Jones/Watson

Mr. Watson:

I received a message that you called my office today. I have no
intention of speaking with you as there's nothing to discuss and I
have no reason or need to speak with you. All that needs to be said
was set forth in my letter.  Please cease communicating with my
office.

Nicholas S. Bressi
[Contact Information]
```

Watson promptly forwarded the email to McKernan without the letter Bressi referenced.  Minutes later, Watson sent McKernan another email stating "the[y] are trying to shut me up or even [k]ill me."

The following day, Watson filed a complaint against Jones with the Cleveland Police Department.  Whether he did so of his own accord or at McKernan's request is disputed.  The "Offense/Incident Report" recounts Watson's claim that a month earlier    on May 13, 2014    Jones claimed to be a "gangster" who would make Watson "disappear" for refusing to murder Jones's agent.  The report lists the alleged violation as "Aggravated Menacing" and states Watson was advised to consult with a prosecutor.  Watson informed McKernan that he had filed the report and stated that "another reason I'm in fear" is because "the NFL [is] nothing but mafia[.]"

In the days that followed, Watson and McKernan communicated with each other several times.  At McKernan's request, Watson sent her a copy of the Offense/Incident Report and, in a series of emails to McKernan on June 16 and 17, expressed his hope that the story would gain maximum exposure:

4

I want to go all the way with this espn,nationl enqure, people mag,cnn,talk shows what ever, this way he will not try to kill me the worid will know! The lawyer is herasing me know. I trust you liz this is real. And let jerry jones know he had a killer on his team. [sic]

. . . .

So what do you think about this story? How fare [sic] do you think this will go? And do you think this will reach the masses. I have no reason to lie my rep is on the line.

McKernan responded: "We have your back . . . Writing everything up right now. . . . What did [the police] say about investigating it?" Watson replied: "They said should have went to the fBI. This need hit tv I'm ready [sic]." McKernan assured Watson the story would go live at "our busiest time for the website, and then it will also go on the show[.]"

The day before publishing the story McKernan made a two-minute call to the records department for the Cleveland Police Department to verify Watson had filed the complaint. A few hours before going live with the murder-for-hire story, McKernan also reached out to Jones by direct message [DM] to his Twitter account, and he responded within minutes:

McKernan: This is Liz from @TMZ_sports. Can you please follow/DM me? We need to talk!

Jones: What's up Liz . . . DM me.

McKernan: We have a police report that was filed against you claiming you hired a hitman to kill your agent[.] [T]he alleged victim claims that he is in fear for his life because of this[.] [W]e wanted to reach out to you about it because it's hard to believe obviously. My number is . . . .

Jones: Call this number and talk to this guy [Bressi's telephone number].

5

McKernan claims she left Bressi a voicemail message that evening; Bressi said he heard from Jones, but not McKernan. Either way, McKernan did not await Bressi's response before the following story was published on TMZ.com at 2:45 a.m. CDT on June 18, 2014:



# EX-SUPER BOWL CHAMP
# SUSPECT IN POLICE INVESTIGATION
## Allegedly Tried to Hire Hit Man

**EXCLUSIVE**

A former **Dallas Cowboys** linebacker has been named the primary suspect in a police investigation in Cleveland after allegedly trying to hire a hit man to take out his agent ... this according to a police report obtained by **TMZ Sports**.

The man at the center of the case is **Robert Jones** -- a 1st round pick in the '92 NFL Draft who went on to become a Pro Bowler who won 3 Super Bowls with the Cowboys.

According to the document, a 47-year-old man named Theodore told police that Jones approached him and tried to hire Theo to take out Jones' agent.

Theo told cops he refused -- and Jones (who's also 47-years-old) -- responded by saying he is a "gangster" and he would make Theodore "disappear."

Theodore told cops he's afraid and fears for his personal safety because he believes Jones will make good on his threat.

So far, Jones has NOT been arrested or charged with a crime. We reached out to Jones several times for comment -- so far, no word back.

6

Within hours after the story hit the internet, Bressi called McKernan and provided readily verifiable information refuting the allegations and discrediting Watson. The reporter offered to send Bressi the Offense/Incident Report Watson had filed with the Cleveland Police Department, and she did so moments later:

> Hi Nick,
>
> Thanks for giving me a call!
>
> Here's the police report[.]
> Let me know when you find out which authority will handle the false report.
> I've called Cleveland PD asking what it is they are even doing about the report. All I know, (from records) is that it's open, and was only recently filed.
>
> Here's my info:
>
> Liz McKernan
> TMZ News Desk
> [Contact Information]
>
> Thanks!

Bressi simultaneously sent McKernan a preview copy of a press release addressing the murder-for-hire plot that TMZ had reported as an "exclusive":

> Subject: Press Release / Robert Jones
>
> Attached please find Mr. Jones' press release for this matter.
> The officer investigating the complaint is unavailable until later this week so I don't have anything further to report on that matter at this time.
>
> Thank you,
>
> Nicholas S. Bressi
> [Contact Information]

Attached to Bressi's email was the following:

---

**PRESS RELEASE**

RE: ROBERT JONES AND FALSE POLICE REPORT FILED BY THEODORE WATSON, JR.

From: Nicholas S. Bressi, counsel for Robert Jones

     Robert Jones deeply regrets that a distant relative has filed a false police report against him. Robert Jones absolutely denies all accusations contained within the false report filed by Mr. Watson and Mr. Jones is in the process of filing his own complaints with law enforcement authorities to address the situation. Robert Jones and his agent have a wonderful relationship and there is not one word of truth contained in the report filed by Mr. Watson.

     Mr. Watson has recently been attempting to extort money from Mr. Jones and has been harassing Mr. Jones and his family for the past several months. Mr. Watson received a cease and desist letter from Mr. Jones's lawyer last week and after receiving that letter apparently Mr. Watson decided to escalate his extortion attempts by filing a false report against Mr. Jones then circulating the false report to the media.

     Robert Jones is confident that when all facts are revealed through the investigation of this matter that his name will be cleared and Mr. Watson's claims will be proven to be without merit.

---

McKernan immediately responded by asking Bressi to delay circulating the press release to other media outlets to allow her time to publish another "writ[e] up" about the story:

> Subject: RE: Press Release / Robert Jones
>
> Thank you!
>
> Writing up now if you can standby on sending to other media for a few minutes[.]

Minutes later, and in obvious response to the information Bressi had supplied, TMZ published the following as an addendum to the original story:

**UPDATE**

**8:21 AM PT** -- Jones says the hit man allegations are complete B.S. -- and insists he's got a great relationship with his agent.

The former NFL star just issued a statement saying the accuser -- a distant relative -- "has filed a false police report" ... and that he "absolutely denies" all allegations.

Jones says he plans on taking legal action of his own against Theodore -- and says the guy has "recently been attempting to extort money" from him and his family.

As far as the allegation that he tried to hire a hit man to take out his agent, Jones says the two have a "wonderful relationship" and the notion that he wants him dead is completely false.

As the one-year statute of limitations was set to expire, Jones sued TMZ, McKernan, and others (collectively, TMZ)[6] for defamation, conspiracy, and other claims. After answering, TMZ moved to dismiss all of Jones's claims under the Texas Citizens Participation Act (TCPA)[7] and,

---

[6] Jones sued TMZ Productions, Inc.; TMZ.com; EHM Productions, Inc., d/b/a TMZ; EHM Productions Inc.; Warner Bros. Entertainment, Inc.; Warner Bros. Technical Operations, Inc., d/b/a Warner Bros. Advanced Digital Services; and Elizabeth McKernan. The court of appeals dismissed all claims against TMZ.com on the basis that it is a domain name and not a legal entity, 538 S.W.3d 781, 804 (Tex. App.—Austin 2017), and no party has appealed that ruling. For ease of reference, all of the defendants, except TMZ.com, are referred to collectively as "TMZ" unless otherwise noted.

[7] *See* TEX. CIV. PRAC. & REM. CODE § 27.003.

in a reply brief to that motion, TMZ further argued that the Defamation Mitigation Act (DMA) bars

Jones's defamation suit because he failed to request a correction, clarification, or retraction of the

murder-for-hire story before the statute of limitations expired on that claim. Jones countered that

such a request is not a prerequisite to suit, but in any event (1) either Bressi's prompt

communications with TMZ or TMZ's responsive update to the story satisfied that prerequisite and

(2) if not, the remedy for noncompliance is abatement and loss of exemplary damages, not

dismissal. The trial court denied TMZ's motion, and TMZ appealed.[8]

The court of appeals affirmed the trial court's judgment as to TMZ's arguments under the

DMA.[9] Construing the statute as a whole, the court held that the consequence for failing to make

a request for correction, clarification, or retraction before the statute of limitations has expired is

not dismissal of the suit but preclusion of exemplary damages.[10] If it were otherwise, the court

observed, the DMA's provisions requiring defendants to timely object to an untimely request and

authorizing defendants to seek abatement of a pending lawsuit to secure a request would be

---

[8] *See id*. § 51.014(a)(12) (authorizing an interlocutory appeal from an order denying a motion to dismiss under the TCPA).

[9] The court rejected TMZ's other challenges to Jones's defamation claim, but TMZ has not appealed those holdings. Nor has Jones appealed the court of appeals' adverse judgment dismissing his claims for intentional infliction of emotional distress, malicious prosecution, and abuse of process under the TCPA.

[10] 538 S.W.3d at 812.

frustrated.[11]  In light of that holding, the court did not reach Jones's alternative argument that any prerequisite to suit under the DMA was satisfied.[12]

We granted TMZ's petition for review.  The parties raise two issues: whether Jones complied with the DMA, and if not, whether dismissal is required.

## II. Discussion

### A. The Defamation Mitigation Act

The DMA was enacted in 2013 "to provide a method for a person who has been defamed by a publication or broadcast to mitigate any perceived damage or injury."[13]  The statute advances that objective by providing sticks and carrots to induce plaintiffs and defendants to take prompt action to rectify defamatory publications so any ensuing damages are ameliorated.  The Act applies to "all publications" in whatever form and all "claim[s] for relief, however characterized, from damages arising out of harm to personal reputation caused by the false content of a publication."[14]

At the heart of this dispute is Jones's compliance with Section 73.055(a) of the Act,[15] which provides that "[a] person may maintain an action for defamation only if" (1) the person or an

---

[11] *Id.* at 812-13 (agreeing with the analysis in *Hardy v. Commc'n Workers of Am. Local 6215 AFL CIO*, 536 S.W.3d 38, 48 (Tex. App.—Dallas Mar. 31, 2017, pet. denied)); *see* TEX. CIV. PRAC. & REM. CODE §§ 73.058(c) ("If a defendant intends to challenge the . . . timeliness of a request for a correction, clarification, or retraction, the defendant must state the challenge in a motion to declare the request . . . untimely served not later than the 60th day after the date of service of the citation."), .062(a) ("A person against whom a suit is pending who does not receive a written request . . . as required by Section 73.055, may file a plea in abatement not later than the 30th day after [filing an original answer]."); *see also id.* § 73.055(a)(1), (b) (requiring a request to be "timely").

[12] 538 S.W.3d at 812.

[13] TEX. CIV. PRAC. & REM. CODE § 73.052.

[14] *Id.* § 73.054.

[15] The parties dispute who bears the burden of proving compliance or noncompliance and whether establishing compliance is part of a defamation plaintiff's prima facie case for purposes of a TCPA dismissal motion.  We do not reach these issues.

11

authorized attorney or agent "made a timely and sufficient request for a correction, clarification, or retraction from the defendant" (a Request) or (2) the defendant has actually "made a correction, clarification, or retraction" (a Change) with or without a request.[16] Compliance with the statute may thus be achieved through *either* a Request *or* a Change.

Under the Act, a Request is "timely if made during the period of limitation for commencement of an action for defamation,"[17] which is one year from accrual,[18] and "sufficient" if it:

(1) is served on the publisher;

(2) is made in writing, reasonably identifies the person making the request, and is signed by the individual claiming to have been defamed or by the person's authorized attorney or agent;

(3) states with particularity the statement alleged to be false and defamatory and, to the extent known, the time and place of publication;

(4) alleges the defamatory meaning of the statement; and

(5) specifies the circumstances causing a defamatory meaning of the statement if it arises from something other than the express language of the publication.[19]

---

[16] *Id.* § 73.055(a).

[17] *Id.* § 73.055(b).

[18] *See id.* §§ 16.002(a) ("A person must bring suit for . . . libel [or] slander . . . not later than one year after the day the cause of action accrues."), 73.055(e) ("A period of limitation for commencement of an action under this section is tolled during the period allowed by Sections 73.056 and 73.057."). The statute authorizes tolling during statutorily authorized investigatory periods. *Id.* §§ 73.056–.057, .059 (authorizing the publisher to request evidence of falsity and providing a time frame during which a publisher can make a Change to cut off liability for exemplary damages).

[19] *Id.* § 73.055(d).

If a Request is made more than 90 days "after receiving *knowledge* of the publication," recovery of exemplary damages is prohibited.[20]  Publishers can also avert liability for exemplary damages by making a statutorily compliant Change, with or without a request, "unless the publication was made with actual malice."[21]

Any challenge to timeliness or sufficiency of a Request must be timely and specific:

If a defendant intends to challenge the sufficiency or timeliness of a request for a correction, clarification, or retraction, the defendant must state the challenge in a motion to declare the request insufficient or untimely served not later than the 60th day after the date of service of the citation.[22]

Unlike a Request, a Change need not be "timely or sufficient" for Section 73.055(a) purposes.[23] But if a defendant intends to rely on a Change in mitigation of damages, the Change must be timely and sufficient, and the defendant must serve notice of intent on the plaintiff within 60 days after service of citation or 10 days after making the Change, whichever is later.[24]  A Change is deemed timely and sufficient unless the plaintiff challenges timeliness or sufficiency within 20 days after receiving such notice.[25]  A timely and sufficient Change is admissible at trial only in mitigation of damages under Section 73.003(a)(3).[26]

---

[20] *Id.* § 73.055(c) (emphasis added).

[21] *Id.* § 73.059.

[22] *Id.* § 73.058(c).

[23] *Compare id.* § 73.055(a)(1), *with id.* § 73.055(a)(2).

[24] *Id.* § 73.058(a).

[25] *Id.* § 73.058(b).

[26] *Id.* § 73.061(b); *see id.* § 73.003(a)(3) ("To determine the extent and source of actual damages and to mitigate exemplary damages, the defendant in a libel action may give evidence of the following matters if they have been specially pleaded . . . any public apology, correction, or retraction of the libelous matter made and published by the defendant.").

If suit is pending and the defendant did not receive a Request "as required by Section 73.055," the statute provides a time-limited process by which a defendant can secure "automatic[]" abatement of the lawsuit.[27] Once the abatement process is properly invoked, the lawsuit is abated "until the 60th day after the date that the written request is served or a later date agreed to by the parties," and in the interim, all statutory and procedural deadlines are stayed.[28]

TMZ argues that Jones failed to make a "timely and sufficient request" as required by Section 73.055(a)(1) of the DMA and, in fact, did not comply with the statute at all. We disagree. Bressi's communications with TMZ constitute a Request; TMZ actually understood Jones to have made a Request; and if Jones's timely communications with TMZ were not "sufficient" under the Act, TMZ's failure to timely challenge sufficiency as required by Section 73.058(c) waived any insufficiency complaints. What is more, and in the alternative, TMZ actually "made a . . . clarification" within the meaning of Section 73.055(a)(2) by (1) providing Jones's side of the story (at least in part) and (2) adding clarifying facts about the central figures in the story.[29] Accordingly,

---

[27] Subsections (a) and (b) of Section 73.062 provide:

(a) A person against whom a suit is pending who does not receive a written request for a correction, clarification, or retraction, as required by Section 73.055, may file a plea in abatement not later than the 30th day after the date the person files an original answer in the court in which the suit is pending.

(b) A suit is automatically abated, in its entirety, without the order of the court, beginning on the 11th day after the date a plea in abatement is filed under Subsection (a) if the plea in abatement . . . is verified and alleges that the person against whom the suit is pending did not receive the written request as required by Section 73.055; and . . . is not controverted in an affidavit filed by the person bringing the claim before the 11th day after the date on which the plea in abatement is filed.

[28] *Id.* § 73.062(b), (c), (d).

[29] *Id.* § 73.057(b)(4) ("publication of the requestor's statement of the facts" is a "correction, clarification, or retraction").

14

Section 73.055(a) is satisfied, and we need not determine whether dismissal is required when the statute of limitations has elapsed without a sufficient Request or Change.

## B. Timely and Sufficient Request

Compliance with the statute is satisfied here because Jones, through his attorney, timely made a sufficient request that actually prompted TMZ to change the story via an "update" issued minutes later. The statute worked exactly as the Legislature intended    Jones promptly notified TMZ about the defamatory nature of its article, placing the ball in TMZ's court to take mitigating action in response.[30]

In arguing otherwise, TMZ focuses on Jones's press release as if it were an out-of-the-blue missive devoid of any context. But the communications between Jones's attorney, Nicholas Bressi, and TMZ's reporter, Liz McKernan, tell a different story and establish Jones's compliance with Section 73.055(a)(1)'s requirements.

The written email exchanges were well within the statute of limitations and were therefore timely.[31] Indeed, Jones's agent contacted TMZ the very day the purportedly defamatory story was published    both by telephone and in writing    concerning the defamatory publication. Those communications did not include the words "I request a correction, clarification, or retraction," but the statute does not require such formality. Bressi's email exchanges with TMZ's reporter    with or without the context provided by their earlier telephone call    clearly communicated Jones's

---

[30] *See id.* §§ 73.056 (allowing the defendant to request—and penalizing the plaintiff for failing to provide—evidence of falsity), .057 (providing the requirements for making a timely and sufficient Change), .059 (a timely and sufficient Change eliminates exemplary damages unless the publication was made with actual malice), .061(b) (the fact that a Change was made and the contents of the Change are admissible in mitigation of damages).

[31] *See id.* § 73.055(b).

15

desire that the false allegations in the article be removed or revised. Indeed, the reporter actually understood it to be such a request, asking Bressi to delay issuing the press release pending a new write up. And in response to Bressi's communications with the reporter, TMZ in fact issued an addendum to the original article incorporating some, but not all, of the information Bressi provided.

As for the Act's remaining sufficiency requirements:

- the record includes evidence that the recipient of the emails, Liz McKernan, published the defamatory statement;

- in a writing electronically signed by his authorized attorney, Jones was identified as the person requesting a change to the article;

- from the language employed in the email exchanges, and as evidenced by the update appended to the original article, the particular publication at issue was known to the reporter;

- the defamatory statement was repeatedly identified as being the false criminal charges Watson lodged against Jones; and

- the defamatory meaning is self-evident from the express language of the publication because falsely accusing someone of committing a crime is defamation per se.[32]

Nothing more is required to satisfy either the letter of the law or its expressly stated purpose.[33]

Moreover, if the sufficiency of Bressi's timely notification that TMZ had published false allegations of criminal conduct was genuinely subject to dispute, the DMA explicitly and

---

[32] *D Magazine Partners, LP. v. Rosenthal*, 529 S.W.3d 429, 439 (Tex. 2018) (accusing someone of committing a crime is defamation per se).

[33] *See, e.g.*, *Sorrell v. Estate of Carlton*, 593 S.W.3d 167, 173 (Tex. 2019) ("substantial compliance is insufficient to satisfy a statutory deadline, [but] it may be sufficient to comply with other statutory requirements," and is sufficient under the redemption statute where a timely, but insufficient, payment was made); *Roccaforte v. Jefferson County*, 341 S.W.3d 919, 926-27 (Tex. 2011) (substantial compliance with notice requirements was sufficient: "[t]he statute was not intended to create a procedural trap allowing a county to obtain dismissal even though the appropriate officials have notice of the suit").

16

unequivocally placed the onus on TMZ to raise an objection within 60 days after being served with the defamation lawsuit, and that did not happen. The record does not disclose the date citation was served, but TMZ's original answer was filed on July 17, 2015, and TMZ did not assert noncompliance with the DMA until November 23, 2015. And even at that late date, TMZ only challenged DMA compliance in its reply brief supporting its motion to dismiss under the TCPA. TMZ's argument dismisses its obligations under Section 73.058(c), but under the statute's express language, TMZ waived any insufficiency complaints.

### C. Correction, Clarification, or Retraction

Jones also satisfied the DMA because TMZ made a Change within the meaning of Section 73.055(a)(2). TMZ asserts the update was not a clarification because it reports only on Bressi's *subsequent* press release and clarifies nothing about TMZ's initial story. Not so. The "update"  which was made directly in response to Bressi's email and parroted its language    clarified the original story by adding at least two facts known to TMZ's reporter *before* the original story issued that were readily verifiable at that time:

1. The "man named Theodore" referred to in the original story was related to Jones; and

2. Theodore Watson and Jones were embroiled in a dispute involving extortion at the time Watson reported the alleged murder scheme to the Cleveland police department.

McKernan chose to omit these facts from the original story, but added them to the update in response to Bressi's communications. TMZ's update (1) clarified the relationship between the story's central figures, who were portrayed as strangers in the original story, and (2) identified the

17

disgruntled relative's motive for filing a false police report, something a stranger would have little reason to do.

Even before publishing the murder-for-hire story, McKernan knew Jones and Theodore Watson were cousins, because that information was included in the Offense/Incident Report. And at least six days before the story went live, McKernan was aware Jones and Watson had been involved in a dispute and that Bressi had sent Watson a letter and an email instructing him to cease communications. McKernan chose not to make further inquiry with either Watson or Bressi about the contents of the letter or the nature of the dispute. But after she spoke with Bressi and had a preview copy of the press release in hand, information about the preexisting dispute was added to the update: "[Jones] says the guy has 'recently been attempting to extort money' from him and his family." These facts add important context to the allegations reported in the original story and provide an ulterior motive for the source's claims against Jones, thus bearing directly on the credibility of the murder-for-hire allegations. In other words, the information McKernan added to the update shed a whole new light on the story TMZ previously reported.

But even more importantly, under Section 73.057(b)(4), a correction, clarification, or retraction is defined as including publication of the other side of the story.[34] By reporting at least some of Jones's side of the story, the update was    by definition    a cognizable Change to the publication and therefore was, as a matter of law, a Change for purposes of Section 73.055(a)(1).[35]

---

[34] TEX. CIV. PRAC. & REM. CODE § 73.057(b)(4).

[35] Whether the changes TMZ made constituted a "sufficient" Change for purposes of allowing TMZ to obtain the statutory benefits of making such a change is disputed but irrelevant to whether a Change was actually made for purposes of compliance with Section 73.055(a)(2), which does not require a Change to be sufficient. *See id.* § 73.055(a)(2) ("A person may maintain an action for defamation only if: . . . the defendant has made a correction, clarification, or retraction."). Sufficiency of the Change is also irrelevant because TMZ did not serve statutory notice

## D. Response to the Dissent

The dissent primarily argues that neither Bressi's communications with TMZ's reporter nor TMZ's update satisfy Section 73.055(a). The facts speak for themselves. The dissent's analysis is also unsound for several other reasons, including the following:

First, the dissent argues Section 73.055(a) acts as a toll booth through which defamation plaintiffs may pass only if they have token 1 (a Request) or token 2 (a Change).[36] But in the dissent's view, whether token 2 allows passage is not based on the defendant's actions in actually making a change to the defamatory publication, but through its unilateral *litigation choices*   specifically, whether it chooses to defensively rely on a change as "sufficient and timely" to mitigate its damages in accordance with Section 73.058(a).[37] According to the dissent, satisfaction of what is purportedly a predicate to passing through the toll booth   whether the defendant actually made a Change   is not for "judicial decision-making"; instead, the "sole statutory test" is whether TMZ gave timely "notice of its intent to rely on the Update as a Change"

---

of intent to rely on the update as mitigating damages. *See id.* § 73.058(a) (placing the burden on defendants to serve timely notice of such intent).

[36] *Post* at 3-4.

[37] *Id.* at 5. Section 73.058(a) provides:

If a defendant in an action under this subchapter intends to rely on a timely and sufficient correction, clarification, or retraction, the defendant's intention to do so, and the correction, clarification, or retraction relied on, must be stated in a notice served on the plaintiff on the later of:

(1) the 60th day after service of the citation; or
(2) the 10th day after the date the correction, clarification, or retraction is made.

19

for purposes of mitigating its damages exposure.[38]  Stated succinctly: a Change is not a Change unless the defendant says so.[39]

Even if that were a plausible construction of the statute, it is not a reasonable one.[40]  The dissent contradicts itself by saying suit cannot go forward at all without token 1 or token 2 while at the same time acknowledging, as it must, that a defendant's notice of intent to rely on a Change under Section 73.058(a) offers, *at best*, an opportunity to mitigate damages.[41]  The dissent construes the DMA as allowing defendants to unilaterally choose to *entirely* avoid a defamation suit by not giving notice of intent to rely on a Change or to *voluntarily submit* to the litigation on the mere possibility that exemplary damages might be eliminated *if* the Change the defendant chooses to rely on is sufficient and *if* the publication was not made with malice.[42]  But what defendant would ever choose to have potentially limited damages exposure instead of zero damages exposure?  Under the dissent's facially unreasonable construction of the DMA, Section 73.055(a)(2) is effectively written out of the statute.[43]

---

[38] *Post* at 5, 10.

[39] In arguing a Change cannot be a Change absent the publisher's intent to make a change for purposes of satisfying the DMA, the dissent adds words to the statute and materially alters its terms. *See id.* at 10.  While changing a publication would involve intentional conduct, the statute says nothing about the defendant's purpose in making a change.  Here, McKernan intentionally made cognizable changes to the original story in response to Bressi's communications with her.  That is enough to make it through the toll booth.

[40] *See In re A.L.M. F.*, 593 S.W.3d 271, 281 (Tex. 2019) ("We must give the statute a meaning that is reasonable when the statute is construed as a whole.").

[41] *Post* at 5, 10.

[42] *See* TEX. CIV. PRAC. & REM. CODE § 73.059 ("If a [Change] is made in accordance with this subchapter, regardless of whether the person claiming harm made a request, a person may not recover exemplary damages unless the publication was made with malice.").

[43] *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 256 (Tex. 2008) ("The Court must not interpret [a] statute in a manner that renders any part of the statute meaningless or superfluous.").

Second, the dissent asserts that "TMZ has never had a chance to address" its noncompliance with Section 73.058(c) because "Jones has not made this argument since filing suit."[44] Section 73.058(c) requires defendants to timely object to a defamation plaintiff's noncompliance with Section 73.055(a)(1). Jones has in fact made that argument, and TMZ has responded:

> Because Bressi's press release and Jones' petition simply are not requests for correction, clarification, or retraction under the DMA, Jones'[s] argument that [TMZ] should have invoked Section 73.058(c) necessarily fails. . . . Section 73.058(c) is implicated only when the defamation claimant has actually made a request for correction, clarification, or retraction under the statute    Jones made no such request.

TMZ's failure to invoke the DMA in the time and manner required by Section 73.058(c) is a fact    one that is indisputable    and the parties' briefs are permeated with the opportunity to address TMZ's compliance. TMZ has repeatedly called Section 73.058(c) one of the "four provisions of the DMA [that] are at issue[.]" Indeed, Section 73.058(c) compliance is central to the parties' dispute about whether dismissal is a remedy when a plaintiff does not comply with Section 73.055(a) before the statute of limitations expires. As to that matter, the parties pointedly discuss whether dismissal is a legislatively contemplated remedy because dismissal would allow defendants to avoid compliance with Section 73.058(c), like TMZ seeks to do here.

The dissent excuses TMZ's noncompliance with "[t]he Act's intricate design" on the basis that Jones's original petition did not allege he made a Request or assert that the updated story is a Change.[45] But the DMA does not impose any special pleading requirements on defamation

---

[44] *Post* at 9.

[45] *Id.* at 5, 9-11.

21

plaintiffs;[46] Jones's pleadings specifically identified Bressi's communications with McKernan about the disputed publication and the responsive update;[47] and the DMA does not require defamation pleadings to specifically label a Request or a Change as such. Rather, the DMA explicitly puts the burden on defendants in a defamation lawsuit to timely (1) object if Section 73.055(a)(1) has not been satisfied and (2) point to a Change if they think it will reduce their damages exposure.[48] TMZ did neither.[49]

Third, the dissent says TMZ's update to the original story cannot be a Change because a Change cannot be defamatory.[50] This misreads the statute. A Change cannot be *sufficient* if it is "defamatory of another, obscene, or otherwise improper for publication," but it can still be a Change.[51]

---

[46] *See* TEX. R. CIV. P. 47(a) (requiring simple notice pleading).

[47] Jones's petition identifies the defamatory publication, the communications between Bressi and McKernan, and the fact that Bressi promptly provided information to McKernan that the publication was false. The dissent implies Jones conceded the update was not a Change by virtue of the following statement in his petition: "Moments after the call with Jones's attorney, TMZ issued an '*Initial Broadcast Update*' to its story—not a retraction or correction, but a mere supplement." *See post* at 9-10. But disclaiming the update as a retraction or correction does not constitute a disclaimer of the update as a clarification because "correction, clarification, or retraction" are listed disjunctively as alternatives under the DMA. *See* TEX. CIV. PRAC. & REM. CODE § 73.055(a)(2).

[48] *See id.* § 73.058(a), (c).

[49] The DMA also permits "[a] person against whom a suit is pending who does not receive a written request for a correction, clarification, or retraction, as required by Section 73.055 [to] file a plea in abatement not later than the 30th day after the date the person files an original answer in the court in which the suit is pending." *Id.* § 73.062(a). TMZ also did not pursue this remedy.

[50] *Post* at 11 (relying on Jones's allegation that TMZ's selective inclusion of parts of his statement added to the defamation).

[51] *See* TEX. CIV. PRAC. & REM. CODE § 73.057(b)(4) ("A correction, clarification, or retraction *is sufficient* if . . . [it] is publication of the requestor's statement of the facts . . . exclusive of any portion that is defamatory of another, obscene, or otherwise improper for publication." (emphasis added)).

22

Fourth, with respect to whether the consequences for failing to satisfy Section 73.055(a) before limitations expires include dismissal or are instead limited to the remedies expressly provided in the statute (abatement and an exemplary-damages bar), the dissent chides the Court for "suggest[ing] the issue does not exist."[52] The charge is inaccurate. This matter is clearly identified as an issue in this case that we do not reach because Jones complied with the statute.[53] In discussing the DMA, we correctly observe the Legislature has enacted specific remedies, including "a time-limited process by which a defendant can secure 'automatic[]' abatement of the lawsuit" when no timely and sufficient request has been made "as required by Section 73.055."[54] But we do not reach the hotly contested issue about the availability of any other remedies that may or may not be inferred from the statutory language.

Finally, the dissent presents a *reductio ad absurdum* argument: if Bressi's timely and substantive communications directly with the publisher of the challenged publication satisfy the DMA, "every future defamation plaintiff will claim a casual tweet or website posting as a Change that gets them through the Section 73.055(a) toll booth,"[55] and "any Twitter message complaining of a story will be a Request, any response by the publisher a Change, and a plaintiff can proceed without further effort."[56] The sky, however, is not falling. The facts of this case do not validate the dissent's concerns. Bressi communicated directly and repeatedly with the point person for the

---

[52] *Post* at 12.

[53] *See supra* at 2, 13-14, 19.

[54] *See supra* at 17-18 (quoting TEX. CIV. PRAC. & REM. CODE § 73.062).

[55] *Post* at 5.

[56] *Id.* at 12-13.

23

"exclusive" story while the story was fresh off the proverbial presses. He also provided verifiable information bearing on falsity of the defamatory article, which the DMA permits the publisher to request.[57] McKernan acted immediately and directly in response by issuing an updated article. Jones cited these facts in his petition, and TMZ did not exercise its prerogative to object or claim the update was sufficient to mitigate any damages. While the dissent charges that "[t]he Act's intricate design has been destroyed" by the outcome of this case,[58] it is the dissent who fails to hold TMZ to the statute's requirements.

### III. Conclusion

We hold that Jones satisfied Section 73.055(a) of the Defamation Mitigation Act because he made a timely and sufficient Request and because TMZ actually made a Change to the story. We therefore affirm the court of appeals' judgment and remand the case to the trial court for further proceedings.

                                               _____

                                               Eva M. Guzman
                                               Justice

**OPINION DELIVERED**: May 8, 2020

---

[57] *See* TEX. CIV. PRAC. & REM. CODE § 73.056.

[58] *Post* at 5.

24